# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **BRADLEY CARTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 5:11-CV-3585-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

The claimant, Bradley Carter, filed applications for Disability Insurance Benefits and Supplemental Security Income Payments on January 31, 2006, alleging disability commencing on an amended onset date of October 1, 2005 because of lower back problems and kidney trouble. The Commissioner denied the claims. The claimant filed a timely request for a hearing before an Administrative Law Judge. The ALJ held an original hearing on August 3, 2007 with a supplemental hearing on December 13, 2007. In a decision dated January 24, 2008, the ALJ found that the claimant was not disabled within the meaning of the Social Security Act, and, therefore, was not eligible for Disability Insurance Benefits and Supplemental Security Income Payments. On July 16, 2008, the Appeals Council denied the claimant's request for review. Having exhausted his administrative remedies, the claimant filed a civil complaint with this court on September 19, 2008. This court subsequently reversed and remanded the case to the Commissioner for further proceedings on March 17, 2010.

The Appeals Council issued a remand order on September 13, 2010, directing the ALJ to obtain additional evidence from an appropriate medical examiner. The claimant appeared before the ALJ for a third hearing on March 21, 2011. In a decision dated May 9, 2011, the ALJ once again found that the claimant was not disabled within the meaning of the Social Security Act, and, therefore, was not eligible for Disability Insurance Benefits and Supplemental Security Income Payments.  On August 11, 2011, the Appeals Council denied the claimant's request for review. The claimant has once again exhausted his administrative remedies and this court has jurisdiction under 42 U.S.C. §§ 405(g) and 1631(c)(3).  For the reasons stated below, the court will affirm the decision of the Commissioner.

## II.  ISSUE PRESENTED

The claimant presents the following issues for review: (1) whether the ALJ improperly applied the Eleventh Circuit's three-part pain standard in evaluating the claimant's testimony of disabling pain and the MRI evidence from October of 2006 that showed possible nerve root encroachment; (2) whether the ALJ improperly gave greater weight to the consulting physician Dr. Norwood's RFC assessment than to the treating physician Dr. Davis' RFC assessment; and (3) whether the ALJ failed to properly respond to this court's remand order by relying on a second RFC assessment from Dr. Norwood, rather than asking Dr. Norwood to clarify his original assessment.

## III.  STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standard and if the factual conclusions are supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.

1987). "This limited review precludes deciding the facts anew, making credibility determinations, or re-weighing the evidence." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11ᵗʰ Cir. 2005).

"No ... presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Id.* at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirely to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but the court must also view the record in its entirely and take account of evidence that detracts form the evidence relied on by the ALJ, *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV.  LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in an substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." To make this determination, the Commissioner employs a five-step, sequential evaluation process:

    (1)      Is the person presently employed?
    (2)      Is the person's impairment severe?
    (3)      Does the person's impairment meet of equal one of the specific

impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. I?

(4)     Is the person unable to perform his or her former occupation?

(5)     Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); *see also* 20 C.F.R. §§ 404.1520 and 416.920.

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. § 404.1529.

When a claimant testifies to subjective complaints of pain, "the ALJ must clearly articulate adequate reasons for discrediting the claimant's allegation of disabling symptoms." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). "Failure to articulate the reasons for discrediting [a claimant's] subjective pain testimony requires, as a matter of law, that the testimony be accepted as true." *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). However, "[a] clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote*, 67 F.3d at 1562.

When evaluating medical source opinions for purposes of RFC assessment

Generally [the ALJ] give[s] more weight to opinions from [the claimant's] treating sources, since these sources are likely to be the medical

professionals most able to provide a detailed longitudinal picture of [the claimant's] medical impairment and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings or from reports of individual examinations, such as consultative examinations.

20 C.F.R. 404.1527(d)(1)(2)(i)(ii).

The Commissioner may, however, "reject the opinion of any physician when the evidence supports a contrary conclusion." *Syrock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). Good cause exists to discredit a treating doctor's opinion when it is conclusory, inconsistent with the doctor's own medical records, "not bolstered by the evidence, or where the evidence supported a contrary finding." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

This court will affirm those factual determinations that are supported by substantial evidence, which is "more than a mere scintilla. [Substantial evidence] means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). And though this court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings" (*Walker*, 826 F.2d at 999), that requirement does not permit this court to re-weigh the evidence or decide facts anew. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 1995).

# V. FACTS

The claimant was forty-five years old at the time of the third ALJ hearing and has a general equivalency diploma (GED). (R. 591). His past work experience includes medium to heavy semiskilled to skilled work as a carpenter, construction worker, and truck driver. (R. 45-46). The claimant originally alleged an onset date of August 12, 2005, but later amended the onset date to October 1, 2005. (R. 591). According to the claimant, he became unable to work

because of worsening back pain traveling into his buttock and left leg because of degenerative

disc disease. (R. 593).  He is presently unemployed. (R. 592).

*Physical Limitations*

In March 2002, the claimant visited Dr. Johnson complaining of back pain caused by an

injury received at his job while lifting boxes of chicken. He received an MRI scan that showed a

herniated disc at the level L5-S1 and a smaller disc bulge at L4-5. During the same month,

plaintiff underwent microdiscectomy surgery at the level of L5-S1 performed by Dr. Johnson. In

follow-up examinations, Dr. Johnson noted the claimant had a negative straight leg raising test

and showed minimal weakness in the left extensor hallucis longus muscle (located in the lower

leg). Dr. Johnson released the claimant to return to light duty work for the first week with lifting

restrictions set at twenty pounds or below, and normal work duties thereafter. The claimant had

no other records reflecting back pain until January 13, 2005, when he visited the Huntsville

Hospital emergency room because of back pain. At that time, a lumbar spine x-ray showed early

degenerative changes, and the claimant was released. (R. 162-76).

Dr. Cromeans, a general practioner, treated the claimant between 2005 and 2006, and

prescribed Lortab, Xanax, and Soma. Dr. Cromeans's records, from April through June 2006,

indicated tenderness in the lumbar area and decreased range of motion in the lumbar spine. On

October 16, 2006, Dr. Cromeans ordered an MRI. The MRI showed degenerative disc disease at

multiple levels, most significantly at levels L4-5 and L5-S1, with possible nerve root

encroachment at level L5, facet anthropy, and an increased signal at L4-5 consistent with annular

tears. Also, an MRI of the left knee showed posterior horn meniscal tears. (R. 238-51).

Dr. Pennington, a general practitioner, treated the claimant between 2006 and 2008, and

prescribed Lortab, Xanax, and Soma medications. His records consist of hand-written notes that

6

solely detail the claimant's complaints and medications prescribed. In August 2007, Dr. Pennington noted the claimant's request for "controlled drugs." Dr. Pennington denied this request. (R. 253-54, 434-37).

The claimant visited Central North Alabama Health Services several times between February 26, 2007 and June 5, 2007, complaining of lower back pain and left knee pain. Those records indicate that Dr. Cromeans had dismissed the claimant after the claimant tested positive for marijuana. The claimant's examinations revealed a full range of motion, negative straight leg raising tests bilaterally, no bony deformities in the knee, and stable hypertension. Central North Alabama Health Service's authorized representative and custodian of medical records, Kywandia Townsend, certified these medical records, and the lab reports indicate that Dr. Nicole Scruggs ran medical tests on the claimant. The examination records do not name the attending physician, however. (R. 256-62).

*The First ALJ Hearing*

At the first hearing on August 2, 2007, the claimant testified that he experienced pain from the bottom of his spine to his left butt cheek and down to his left leg. He also claimed that he experienced panic attacks. On a scale of one to ten, the claimant rated his pain as nine. The claimant testified that his prescribed medications, Celebrex, Ultram, Lyrica, and Atenolol, did provide some relief. The claimant testified that he had worsening back pain after surgery and physical therapy. Regarding the claimant's limitations, he testified that he could probably walk an eighth of a mile and stand for approximately five to ten minutes. He also testified that he could not sit for a long period of time before having to switch positions; when at home, he stated that he usually lies down and flips from side to side or between his back and stomach. (R. 37-39, 41).

7

Regarding the claimant's daily living activities, the claimant testified that his mother did the grocery shopping and that he could not do any laundry, vacuuming, or cooking, besides microwavable dinners. Regarding the claimant's side effects from medications, the claimant testified that Xanax caused memory loss and sleepiness, and Soma caused sleepiness. The claimant also testified that he had been addicted to pain medications in the past. The claimant acknowledged that he had been charged with a DUI because he had taken too many drugs to relieve his pain. He also acknowledged that he had been arrested for shoplifting personal items, such as razors, deodorant, and soap from Wal-Mart in 2006. (R. 40-43).

The ALJ questioned the claimant and the vocational expert (VE) about his work abilities. The claimant testified that he could not go back to any of his previous jobs because sitting would bother him, and he would be jumpy and jittery. The claimant further testified that his pain would require him to be absent from work two to four times per month. (R. 43-45).

The ALJ posed four hypothetical situations to the VE. The ALJ based his first hypothetical on the restrictions listed for sedentary work, coupled with the claimant's age, education, and work experience. The VE stated that the claimant would be precluded from any past work, but that unskilled-sedentary work would be available. The VE gave examples such as job sorter, table worker, and assembler, all of which exist in significant numbers in the national economy. Then, the ALJ asked a series of hypothetical questions based on the limitations alleged in the claimant's testimony. The VE ruled out all work if claimant's testimony were true about having to take more work breaks than normal and having to miss two or more days of work per month because of pain. In the ALJ's last hypothetical, the VE ruled out all work if the claimant's pain, discomfort, and side effects from medications affected his concentration, persistence, and pace for up to two hours at a time. Because of the ALJ's RFC finding and the claimant's age,

education, work experience and VE's testimony, the ALJ determined that the claimant was not disabled because he could make a successful adjustment to other jobs existing in significant numbers in the national economy. (R. 22, 46-49).

*Post-Hearing Consultative Exam*

After the first hearing, the ALJ referred the claimant to Dr. Eston Norwood, a consultative neurologist, for an evaluation on August 30, 2007.  Dr. Norwood noted the October 2006 MRI scan of the claimant's spine and knee. He also noted that the claimant walked slowly with an antalgic gait and had "voluntary guarding limited range of motion in the lower back," but had good range of motion in the neck and extremities, including the left leg and knee. Dr. Norwood accepted the claimant's reported limitations: "He reports increased back pain associated with sitting, standing, walking, lifting and carrying.  I have filled out the Medical Source Opinion (Physical) to indicate his reported limitations."  Dr. Norwood determined "no objective neurologic deficit [exists], and [the claimant] does not have [a] physical neurologic impairment to do work-related activities including sitting, standing, walking, lifting, carrying, and handling objects." Dr. Norwood completed a residual functional capacity (RFC) assessment questionnaire based on the claimant's subjective complaints. His questionnaire assessed the frequency with which the claimant could perform certain activities. For example, he concluded "that the claimant can occasionally stoop, kneel, crouch, and crawl; [and] that he can frequently push and pull with legs." He also found that the claimant could "constantly push and pull with his arms, climb, balance, handle and finger objects, reach overhead, talk, [and] hear." Lastly, Dr. Norwood noted that the claimant could "constantly be around temperature extremes, wetness, humidity, vibrations, pulmonary irritants, moving machinery, unprotected heights; and operate automotive equipment." However, the assessment questionnaire did not specifically assess the

9

*frequency or length of time* the claimant could sit, stand, walk, lift, and carry objects. (R. 20, 53, 263-267).

*The Second ALJ Hearing*

At the second hearing on December 13, 2007, the ALJ questioned the claimant about his previous work history, Dr. Norwood's consultation, and his daily living activities. The claimant testified that he could not go back to his job as a carpenter because he did not have good balance and could not climb. (R. 54-66).

Regarding his consultation with Dr. Norwood, the claimant testified that the exam lasted approximately five minutes during which Dr. Norwood pricked him with a bobby pin and asked him to do a heel walk. Dr. Norwood did not require the claimant to climb any stairs or do any balancing tricks. The claimant also stated that he could not be around extremely cold or hot temperatures because the weather "locks [his] back up" and makes him feel like he had arthritis in his back and knee. The claimant testified that he did not drive because of the warnings on his medications that caution against driving. He stated that he could only sit for about fifteen to twenty minutes before he has to walk or lie down. On a scale of one to ten, the claimant rated his pain as an eight or nine, but after medication maybe a five or six. (R. 55-60).

The ALJ asked the claimant about his daily living activities. The claimant stated that he could no longer hunt, fish, play basketball and baseball, or play with his daughter. The claimant testified that he could not walk around Wal-Mart completely because standing on hard surfaces made his back tighten up in a big knot. He stated that his girlfriend did the grocery shopping, but he could go "in and out" of the Dollar General store to just get what he needs because he knows the layout of the store well. The claimant said he could not vacuum, sweep, mow the yard, take out the trash, or bring in the groceries other than the eggs. The claimant reported that he could

not take a bath and had trouble shaving and showering. Regarding the side effects of his medications, the claimant reported that the medications make him dizzy, drowsy, and sleepy. He also stated that he had a hard time focusing, concentrating, and paying attention. The ALJ confirmed the VE's prior testimony, but did not ask the VE any additional questions. (R. 61-67).

*The ALJ's First Decision*

On January 24, 2008, the ALJ issued a decision finding the claimant not disabled under the Social Security Act. The ALJ determined the claimant was not performing substantial gainful work. The ALJ noted the claimant had severe impairments, including degenerative disc disease of the lumbar spine, which was status post microdiscectomy at the level of L5-S1; left knee pain; hypertension; and anxiety. The ALJ determined that the claimant's impairments or combination of impairments did not meet any of the listed impairments in 20 C.F.R. pt. 404, subpart P, app. 1. The ALJ found the claimant's "medically determinable impairments could reasonably be expected to produce the alleged symptoms the claimant testified to at the ALJ hearing, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (R. 16-18, 23).

As support for his credibility finding, the ALJ first looked to the claimant's previous income statements. The ALJ decided that the claimant's work activity after the surgery on March 27, 2002, in which he earned $8,179 in 2003, $22, 256 in 2004, and $6,991 in 2005, was inconsistent with the claimant's allegations that he had no improvement after surgery and that his back pain was worsening. Second, the ALJ noted that he believed the claimant's testimony about not being able to do any shopping was inconsistent because the claimant stated at the first hearing that his mother does the shopping, while at the second hearing he stated that his girlfriend does the shopping; and that he admitted to shoplifting for basic necessities in Wal-

11

Mart. Third, the ALJ found that the claimant's testimony about the side effects of his medications were inconsistent, stating that the claimant said he had no side effects from pain medications, but that Xanax and Soma cause sleepiness and memory loss. (R. 19-21).

In assessing the claimant's residual functional capacity, the ALJ accorded greater weight to the opinion of Dr. Norwood, the consulting physician, because the claimant's treating physicians, Dr. Pennington and Dr. Cromeans, general practitioners, gave no opinion regarding the claimant's abilities or limitations, but only provided handwritten notes of treatment for subjective complaints and very few clinical or objective findings. Because of Dr. Norwood's examination and the inconsistencies listed above, the ALJ gave the claimant a residual functional capacity to perform work-related activities at no more than the sedentary level. The ALJ concluded that the claimant could not perform any past relevant work because of the following restrictions: the claimant must have a sit/stand option and could not sit or stand for greater than thirty minutes at one time; he could not climb ropes, ladders, or scaffolding; he could not work around dangerous heights or unguarded moving machinery; he could not drive commercially; he had no greater than moderate restrictions on daily living activities, social functioning, and maintaining concentration, persistence, and pace; he could do no more than unskilled work. (R. 17, 20-21).  However, The ALJ found that significant jobs existed in the national economy that someone with these limitations could perform, such as a sorter, a table worker, and an assembler. (R. 22).

### The District Court's Decision

On July 16, 2008, the Appeals Council denied the claimant's request for review of the ALJ's decision. The claimant then filed a civil complaint with this court on September 19, 2008. The court carefully reviewed the record and the ALJ's decision and determined that the ALJ's

finding that the claimant was not disabled for purposes of disability insurance and supplemental

security income was not supported by substantial evidence. Specifically, this court found that the

ALJ's decision relied on an incomplete, internally inconsistent RFC assessment completed post-

hearing by Dr. Eston Norwood, a one-time consulting neurologist. The court found that the RFC

assessment was incomplete because it did not contain the customary assessment of certain

exertional limitations, such as claimant's ability to sit, stand, walk, lift, or carry. Furthermore,

Dr. Norwood assessed neither the duration for which the claimant could sit, stand, or walk, nor

the weights and frequency that the claimant could lift and carry. As such, the ALJ's reliance on

Dr. Norwood's assessment was reversible error, and this court subsequently reversed and

remanded the case to the Commissioner for further proceedings on March 17, 2010. (R. 307-21).

The Appeals Council then issued a remand order on September 13, 2010 that ordered the ALJ to

obtain additional clarification and/or evidence from an appropriate medical examiner. (R. 322-

25).

*Additional Medical Evidence of Physical Limitations*

The claimant filed an additional application for disability benefits with the SSA in

December of 2008.[1] Pursuant to that application and at the request of the Disability

Determination Service, Dr. Jon Rogers, a psychologist, examined the claimant on April 8, 2009.

Dr. Rogers found that the claimant had a restricted affect; suffered from a depressed and anxious

mood; was able to spell backwards; could recall 5 digits forward and 3 backwards; could

interpret 2 of 3 proverbs; and could discuss his recent activities. The claimant told Dr. Rogers

that he had a history of marijuana and cocaine abuse, but that pain medications were his "drugs

---

[1] The SSA subsequently consolidated both of the claimant's applications, and they appear
jointly before the court in this case.

13

of choice." Dr. Rogers rated the claimant's insight and judgment as poor to fair. Dr. Rogers'

diagnostic impression was that the claimant had a pain disorder associated with psychological

factors and his general medical condition; an adjustment disorder with mixed anxiety and a

depressed mood; alcohol and cannabis abuse (in remission by self-report); and psychological

stress stemming from his difficulties relating to his occupational problems. Dr. Rogers's

diagnostic impression also included degenerative disc disease; residual effects of injury to the

claimant's left knee; residual effects of injuries to the claimant's back sustained in 2003;

headaches; high blood pressure; and daily pain in the claimant's lower back and left knee. (R.

444-48).

On April 24, 2009, consultative examiner Dr. Marlin Gill, a family practitioner, also

examined the claimant pursuant to his second disability application. Dr. Gill noted that the

claimant "spends his time sitting and watching television. He is able to drive. He can go to the

grocery store for brief shopping trips. He takes care of his own personal needs, such as bathing,

dressing, eating, etc.. He can sit for a maximum of 45 minutes, stand for a maximum for 45

minutes, and walk for a maximum for one-fourth mile. No assistive devices are used." (R. 452).

Dr. Gill found that the claimant's blood pressure was 130/80; his lungs were clear; his heart

sounds were normal; his gait was normal; and his strength was 5/5 with a full range of motion in

all joints of the upper extremities. Dr. Gill additionally found that the claimant had no dexterity

problems; no tenderness to palpation in the lumbar area; some discomfort moving the lumbar

spine, but still able to forward flex to 80 degrees and rotate 10 degrees in both directions; and his

strength was 5/5 in his legs. Dr. Gill observed that the range of motion of the claimant's hips was

full; the claimant had some crepitus in the knees, but no swelling or tenderness in the knees; and

the range of motion of the left knee was only slightly limited (flexion of the right knee was 150

14

degrees, whereas flexion of the left knee was 140 degrees). Dr. Gill noted no neurological deficits in the claimant's legs and noted that the claimant was able to squat and arise, and walk on his toes and heels. Dr. Gill's impressions were low back pain with a history of herniated disc surgery in 2003, and left knee pain with a reported history of a torn left meniscus. Dr. Gill noted no limitations. (R. 452-53).

Additionally, Dr. Robert Estock, a psychiatrist with Alabama Disability Determination Services, reviewed the evidence on June 3, 2009, and concluded that the claimant's mental impairments have resulted in a mild restriction of daily living activities; mild difficulty with maintaining social functioning; and no more than moderate difficulty with maintaining concentration, persistence and pace. He concluded that the claimant had not had any episodes of decompensation of extended duration. As to the claimant's mental residual function capacity, he concluded that the claimant is moderately limited in the following areas: the ability to understand, remember, and carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to interact appropriately with the general public; and the ability to respond appropriately to changes in the work setting. (R. 454-70).

Attending physician Dr. Steven Werdehoff admitted the claimant to the Huntsville Hospital Emergency Room on September 20, 2009, after the claimant slipped on wet steps. Dr. Werdehoff ordered an x-ray on the claimant's back, conducted by Dr. Joseph Scales. Dr. Scales found that the claimant's lumbar spine had normal alignment with "mild disc space narrowing at L4-5 and more prominent narrowing at L5-S1." His impression was "significant disc space collapse and degenerative change at L5-S1." Dr. Werdehoff then discharged the claimant with prescriptions for Ibuprofen, Lortab, Flexeril, and Mobic. (R. 477-504).

On November 25, 2009, Dr. S. Nuthi examined the claimant to conduct a pain assessment

for purposes of the claimant's disability application. Dr. Nuthi's impressions were that the claimant had lower back pain and left knee pain. Dr. Nuthi referred the claimant to Dr. Shelinder Aggarwal. (R. 506-508).

On December 25, 2009, attending physician Dr. Pam Haws admitted the claimant to the emergency room of Athens-Limestone Hospital for complaints of lower-back pain and left knee pain. Dr. Haws ordered x-rays on the claimant's left knee and lower back. According to Dr. Tim Baker, radiologist, the x-rays showed no knee effusion; normal alignment; no radiopaque foreign body; no fracture; and a well-maintained joint. In relation to the lumbar spine, the x-rays also showed "intervertebral disc space narrowing at L5/S1 with evidence of vacuum disc." Dr. Baker's impression of the x-rays was "negative views of the left knee," and "no acute lumbar findings." The claimant requested prescriptions for Lortab and Soma, but the records indicate that the only prescriptions issued were for Mobic, Flexeril, Medrol and a walking stick. However, the claimant refused the prescriptions for Mobic, Flexeril, and Medrol.   Dr. Haws discharged the claimant with orders to rest his knee and his back and follow up as needed. (R. 510-23).

Treating physician Dr. Shelinder Aggarwal first saw the claimant on January 11, 2010, pursuant to Dr. Nuthi's referral. Dr. Aggarwal noted that the claimant had a 50% decreased range of motion in the lumbar spine. However, Dr. Aggarwal found that the claimant's motor strength was 5/5 in his legs; his sensation was intact; and his deep tendon reflexes were 2+ and equal. Dr. Aggarwal's impressions were that the claimant had anxiety and lower back pain secondary to arthritis. Dr. Aggarwal prescribed Lortab, Soma, and Xanax. The claimant came to Dr. Aggarwal on February 8 and March 8 of 2010 for prescription refills. (R. 525-29).

Treating physician Dr. L. J. Davis of Physician Care-Med Care East first saw the

16

claimant on June 10, 2010 in response to the claimant's complaints of lower back pain and left knee pain. Dr. Davis examined the claimant and found that the claimant had forward flexion of less than 60 degrees and a depressed mood. Dr. Davis's impressions were that the claimant had arthritis, back pain, and anxiety. Dr. Davis prescribed Lortab, Soma, Phenergan, Percocet, and Xanax to control the claimant's symptoms. Dr. Davis also noted that the claimant tested positive for THC/marijuana during a urine drug screen and that the claimant admitted to recent exposure to marijuana. (R. 539-47). Dr. Davis treated the claimant for complaints of lower back pain and knee pain through January 2011 by refilling the claimant's prescriptions for Lortab, Soma, Phenergan, Percocet, and Xanax. Dr. Davis noted that these medications controlled the claimant's symptoms, but his records do not indicate any further clinical findings. (R. 566-83).

On March 24, 2011, Dr. Davis completed a "Clinical Assessment of Pain" at the claimant's request for purposes of his disability application. Dr. Davis stated that, in his best clinical judgment, the claimant was in pain to such an extent as to be distracted from adequate performance of daily activities or work; that pain greatly increased, and to such a degree as to cause distraction from tasks or total abandonment of tasks, when the claimant performed physical activities such as prolonged sitting, walking, standing, bending, stooping, moving of extremities, etc.; that the claimant could expect to experience severe side effects from the medications he had been prescribed, and that these side effects would limit the claimant's effectiveness due to distraction, inattention, drowsiness, etc.; and that the claimant had underlying medical conditions consistent with this level of pain. (R. 585-86).

Also, pursuant to this court's remand, Dr. Norwood evaluated the claimant for a second time on November 10, 2010. Upon examining the claimant, Dr. Norwood reported that the claimant could stand with knees extended and bend at the waist until his fingertips were within

12 inches of his toes, which was approximately 90% of full flexion. The claimant could extend at the waist for 50% of full extension; could lean to the left and rotate to the left for 50% of full extension; and could lean to the right and rotate to the right for 80% of full extension. The claimant had an antalgic gait that favored his left knee, and his gait improved with a walking stick. The claimant's strength was normal on careful testing in all muscle groups in the arms and legs, despite the claimant's reports of occasional discomfort. The claimant's reflexes were trace at the knees and ankles, and 1+ at the wrists symmetrically. The claimant had no muscle spams; could walk on his heels and toes independently; and could arise from a sitting position without assistance. After exercise, the claimant retained good strength. The claimant could make a fist bilaterally, and could use his hands to untie and retie his shoes. Dr. Norwood concluded that the claimant had no definite signs of medication side effects or neurological deficits and that the claimant did not have any neurological impairment to do work-related activities. Dr. Norwood's impressions were of back pain and left leg pain. (R. 555).

These medical findings provided the basis for Dr. Norwood's medical opinion that the claimant has the following limitations: the claimant could lift and carry ten pounds frequently and up to twenty pounds occasionally; could sit, stand, and walk for up to ten minutes at one time; could sit for up to six hours in an eight hour work day; and could stand and walk for up to one hour in an eight hour work day.  Dr. Norwood found that the claimant did not require the use of a cane; had full use of both of his hands; could continuously operate foot controls with his right foot and occasionally with his left; and could occasionally climb stairs, ramps, ladders, and scaffolds. The claimant could also balance and stoop frequently; kneel, crouch, and crawl occasionally; had no serious environmental limitations; and could see to almost all basic personal errands and care. (R. 556-61).

18

*The Third ALJ Hearing*

The claimant appeared before the ALJ for a third hearing on March 21, 2011. At the hearing, the claimant testified that he had back surgery in 2003; that his pain improved, but worsened later; that he has pain in his lower back and left leg; that his left leg gives way with him; that he also has left knee pain; that he uses a broom handle for a cane when he walks; that he has been taking Lortab for pain for 5-6 years; that he also takes medication for anxiety and muscle spasms; that his pain is 8-9 on the 10-point scale without medication, but his medications reduce his pain to the level of 5-6; and that the cold weather worsens his pain. In describing his functional limitations, the claimant stated that he can sit for 15 minutes, walk for 30 yards, stand for 5-10 minutes without interruption, and lift half of a gallon of iced tea. In describing his daily living activities, the claimant testified that he gets up around 7:30 a.m.; that he has to sit while taking a shower; that he is able to shave himself in the morning, but does so in a piecemeal manner; that he lives with his mother and brother; and that he spends twenty to twenty-two hours of the day laying down in his room in a fetal position and watching television. The claimant's brother, Jeff Carter, testified that he lives with the claimant and his mother. He stated that the claimant's major problem is back pain, and that he stays in his bed. He stated that he does not believe that the claimant could do a seated type assembly job because he would have to get up to get parts.

When asked if the claimant has had any recent arrests or legal problems, the claimant stated that he was arrested for shoplifting in 2005, and he was arrested for theft of property in 2006. He stated that he was arrested in June 2009 for possession of a controlled substance, pled guilty to those charges, and received a one year suspended sentence with  two years probation. He stated that he was arrested again in January 2011 on additional drug possession charges and

19

was to go to trial on those charges in April 2011.

Mr. John McKinney, a vocational expert, also testified at the hearing. The VE testified that the claimant had past relevant work history as a commercial painter, which was a medium exertional and skilled occupation; as a construction worker I, which was a heavy exertional and semiskilled occupation; and as a route driver, which was a heavy exertional and semiskilled occupation. When asked by the ALJ if a forty-five year old individual with a G.E.D. and a restricted RFC for light work such as that described by Dr. Norwood, could perform the claimant's past relevant work, the VE testified that such a person could not perform the claimant's past relevant work. The VE further testified, however, that such a person could perform other light, unskilled jobs within those limitations that were available in significant number within the national economy, such as gate guard, production inspector, and hand packager. (R. 618-23).

### The ALJ's Second Decision

In a decision dated May 9, 2011, the ALJ once again found that the claimant was not disabled within the meaning of the Social Security Act, and, therefore, was not eligible for Disability Insurance Benefits and Supplemental Security Income Payments. The ALJ determined that the claimant was not performing substantial gainful work. The ALJ noted the claimant had the following severe impairments: degenerative disc disease of the lumbar spine, and is status post microdiscectomy at the level of L4-L5 on the left in March 2002; complaints of left knee pain; hypertension; an adjustment disorder with mixed anxiety and a depressed mood; a pain disorder associated with psychological factors and general medical condition; and alcohol and cannabis abuse, in remission by self report. (R. 282-83). The ALJ determined, however, that the claimant's impairments or combination of impairments did not meet any of the listed

20

impairments in 20 C.F.R. pt. 404, subpart P, app. 1. The ALJ found that the claimant's "medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with [a residual functional capacity to perform light work]." (R. 282-85).

In assessing the claimant's residual functional capacity, the ALJ accorded greater weight to the opinion of Dr. Norwood, the consulting physician. The ALJ found that Dr. Davis' pain assessment questionnaire was not entitled to substantial weight because Dr. Davis had made few objective clinical findings of his own, other objective medical evidence of record did not support his opinion, and the claimant's subjective testimony was not credible. The ALJ found that Dr. Norwood's assessment was more consistent with the medical record as a whole. (R. 290-91).

In support of his credibility finding, the ALJ looked to inconsistencies between the claimant's testimony of disabling pain that caused him to lie in bed in a fetal position for twenty to twenty-two hours per day and the medical evidence of record. The ALJ noted that the claimant had improved after Dr. Johnson's surgery on the claimant's back in 2002 and that the claimant had not complained of back or leg pain again until 2005. The ALJ observed that the claimant's "MRI scan of the lumbar spine in October 2006 revealed degenerative disk [sic] disease at L4-5 and L5-S1 with possible nerve root encroachment at L5-S1, and the MRI scan of the left knee at the time indicated posterior horn meniscal tears." (R. 291). The ALJ also noted, however, that the record did not show that any further back or knee surgery had been recommended, and subsequent examinations had shown mostly negative findings and did not support the claimant's allegations of moderately severe to severe pain. Additionally, the ALJ noted that Dr. Norwood's examination in August 2007 showed some limitation of motion in the

claimant's back. The ALJ pointed out, however, that Dr. Norwood's examination also showed strength at 5/5, symmetrical deep tendon reflexes, normal sensation, and normal range of motion in the left knee. Dr. Gill's 2009 examination showed almost full range of motion in the claimant's lumbar spine, normal gait without assistive devices, and 5/5 leg strength. Dr. Gill found that the claimant could squat, arise, and walk on his toes and heels; had no tenderness or swelling in the left knee, which had almost a full range of motion; and had intact sensations and reflexes. Dr. Norwood's second assessment in November 2010 showed that the claimant had only a mildly limited range of motion; an antalgic gait; equal reflexes; and normal sensation and strength. (R. 291).

The ALJ observed that, though Dr. Pennington treated the claimant for back pain and knee pain between 2005 and 2008, Dr. Pennington's records contained no examination results or results from any objective tests. The ALJ stated that Dr. Cromeans' records from 2005 to 2006 largely suffered from the same lack of clinical findings, though the ALJ found that Dr. Cromeans had noted tenderness in the lumbar area and a decreased range of motion in the lumbar spine. The ALJ additionally noted evidence from Dr. Scruggs at Central North Alabama Health Services that showed that the claimant had a full range of motion and a negative straight leg raising test bilaterally. (R. 291).

The ALJ also noted the medical evidence submitted since the first ALJ's ruling. Specifically, the ALJ observed that Dr. Rogers found that claimant had a "global assessment of functioning score of 51, consistent with moderate symptoms, or moderate difficulty with social and occupational functioning." The ALJ further noted Dr. Rogers' statement that the claimant had a moderate impairment of his ability to understand, remember, and carry out instructions. (R. 292).

The ALJ considered Dr. Estock's psychiatric evaluation in which Dr. Estock found that "the claimant's mental impairments have resulted in a mild restriction of daily living activities, mild difficulty with maintaining social functioning, and no more than moderate difficulty with maintaining concentration, persistence and pace." The ALJ also noted Dr. Estock's opinion that the claimant's mental residual functional capacity was moderately limited in the areas of "ability to understand, remember and carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to interact appropriately with the general public; and the ability to respond appropriately to changes in the work setting." The ALJ found that Dr. Estock's findings were supported by the medical evidence of record and were entitled to substantial weight. (R. 287-88).

Finally, the ALJ noted that the claimant had "engaged in drug seeking behaviors and/or may have an issue with addiction to those medications." Specifically, the ALJ noted that Dr. Cromeans had dismissed the claimant from treatment after the claimant had tested positive for marijuana; that Dr. Pennington had noted the claimant's desire for "controlled" drugs; that the claimant had repeatedly requested Lortab and Soma when he visited the emergency room in December 2009, and had refused medications of Mobic and Flexeril; that the claimant tested positive for benzodiazipines and marijuana/THC in June 2010; that the claimant had obtained Lortab, Soma, and Xanax from several physicians at the same time; and that the claimant admitted a history of marijuana and cocaine abuse to Dr. Rogers in April 2009, with "pain medications as his drugs of choice." Additionally, the claimant was arrested for shoplifting in 2005, theft in 2006, and on drug-related charges in 2009 and 2011. The ALJ found that "the claimant's criminal history and history of substance abuse reflects adversely on his credibility," and that "it seems less than plausible that [the claimant] could find himself out of his house and

23

subject to being arrested in both 2009 and in 2011 while also managing to see physicians on numerous occasions during the 2-4 hours he was not curled up in a fetal position due to pain." (R. 291-92).

Because of Dr. Norwood's and Dr. Estock's examinations and the inconsistencies listed above, the ALJ found that the claimant had a restricted residual functional capacity to perform light work, meaning that the claimant can:

> occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds; that he can walk for one hour during an eight hour workday and for 10 minutes without interruption; that he can stand for one hour during an eight hour workday and for 10 minutes without interruption; that he can sit for six hours during an eight hour workday and for 10 minutes without interruption; that he has no limitations on his ability to use his hands for work activities that he can continuously use his right foot and occasionally use his left foot to operate foot controls; that he can occasionally climb stairs, ramps, ladders and scaffolds; that he can frequently balance and stoop, and can frequently kneel, crouch, and crawl; that he has no environmental limitations; and that he needs to avoid loud/heavy traffic noises. In regard to the claimant's mental limitations, he has no greater than a moderate restriction or limitation in daily living activities and social functioning and in maintaining concentration, persistence, and pace, and he should do no more than unskilled type work.

(R. 283).

The ALJ concluded that the claimant could not perform any of his past relevant work because the vocational expert testified that the claimant's past relevant work as a commercial painter, a construction worker I, and as a route driver all classified as medium to heavy work that was semiskilled to skilled in nature. Hence, the claimant's residual functional capacity for unskilled, light work did not permit him to continue work at either the exertional level or skill level of his previous jobs. (R. 292-93).

The ALJ found, however, that the claimant's age, education, and residual functional

capacity led to a conclusion that the claimant was "not disabled" because the claimant could perform several different jobs that existed in significant numbers in the national economy. Specifically, the ALJ relied on the vocational expert's testimony and found that the claimant's age, education, and RFC permitted him to work such unskilled jobs as gate guard, production inspector, and hand packager. (R. 293-94).

For these reasons, the ALJ denied the claimant's application for disability benefits, and on August 11, 2011, the Appeals Council denied the claimant's request for review, making the ALJ's March 21, 2011 decision the final decision of the Commissioner.

## VI. DISCUSSION

The claimant argues that the ALJ failed to properly apply the Eleventh Circuit's three-part pain standard because the ALJ improperly evaluated (A) the claimant's testimony of disabling pain, and (B) MRI evidence from October of 2006 that showed possible nerve root encroachment.

Additionally, the claimant argues that the ALJ improperly gave greater weight to the consulting physician Dr. Norwood's RFC assessment than to the treating physician Dr. Davis' RFC assessment, because the ALJ did not specify why Dr. Norwood's medical opinion should receive greater weight.

Finally the claimant argues that the ALJ failed to properly respond to this court's remand order by relying on a second RFC assessment from Dr. Norwood, rather than asking Dr. Norwood to clarify his original assessment.

For the reasons below, the court find that the ALJ properly applied the Eleventh Circuit's pain standard, properly evaluated the medical opinions of record, and properly responded to this court's remand order. Therefore, this court affirms the ALJ's decision.

**I. The ALJ Properly Applied the Eleventh Circuit's Pain Standard.**

The claimant argues that the ALJ did not properly evaluate the claimant's pain under the Eleventh Circuit's pain standard because the ALJ discounted the claimant's subjective testimony about his pain and discounted MRI evidence showing possible nerve root encroachment. The Eleventh Circuit requires that an ALJ evaluate pain and other subjective complaints by considering whether the claimant demonstrated an underlying medical condition, and either "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). The ALJ noted that the claimant had demonstrated an underlying medical condition that could reasonably be expected to produce the claimant's pain, but he found that the claimant's testimony about the severity of that pain was not credible and was not substantiated by the objective medical evidence of the record. As discussed below, this court finds that the ALJ properly applied the Eleventh Circuit's three-part pain standard and substantial evidence supports his decision.

**A. The ALJ Properly Evaluated the Claimant's Subjective Testimony.**

The ALJ found that the claimant's testimony was not credible in as far as it conflicted with a restricted RFC for light work for several reasons. When a claimant testifies to subjective complaints of pain, "the ALJ must clearly articulate adequate reasons for discrediting the claimant's allegation of disabling symptoms." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Failure to articulate reasons for discrediting claimant's testimony requires that the testimony be accepted as true. *See Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). When the ALJ "clearly articulated [a] credibility finding with substantial supporting evidence in

the record," however, a reviewing court will not disturb that finding. *Foote*, 67 F.3d at 1562. This court finds that the ALJ clearly articulated his credibility finding and that substantial evidence in the record supports his findings.

The ALJ found two aspects of the claimant's history that affected his credibility.  First, ALJ found that the claimant had "engaged in drug seeking behaviors and/or may have an issue with addiction to those medications." The ALJ noted that Dr. Cromeans had dismissed the claimant from treatment after the claimant had tested positive for marijuana; that Dr. Pennington had noted the claimant's desire for "controlled" drugs; that the claimant had repeatedly requested Lortab and Soma when he visited the emergency room in December 2009, and had refused medications of Mobic and Flexeril; that the claimant tested positive for benzodiazipines and marijuana/THC in June 2010; that the claimant had obtained Lortab, Soma, and Xanax from several physicians at the same time; and that the claimant admitted a history of marijuana and cocaine abuse to Dr. Rogers in April 2009, with "pain medications as his drugs of choice." Additionally, the claimant had been arrested on drug-related charges in both 2009 and 2011. (R. 290-91).

Second, the ALJ noted that the claimant had a history of criminal conduct. In 2005, the claimant was arrested for shoplifting; in 2006, the claimant was arrested for theft; in 2009, the claimant was arrested for possession of a controlled substance; and in 2011, the claimant was arrested on additional drug possession charges. (R. 292).

The ALJ concluded that "the claimant's criminal history and history of substance abuse reflects adversely on his credibility," and that "it seems less than plausible that [the claimant] could find himself out of his house and subject to being arrested in both 2009 and in 2011 while also managing to see physicians on numerous occasions during the 2-4 hours he was not curled

27

up in a fetal position due to pain." (R. 292). For these reasons, the ALJ found that the claimant's testimony was not credible to the extent it conflicted with a restricted RFC for light work. (R. 292). This court finds that the ALJ articulated adequate reasons for discounting the claimant's credibility, and that the ALJ's credibility determination was supported by substantial evidence.

**B. The ALJ Properly Evaluated the MRI Evidence of October 2006.**

The claimant also argues that the ALJ's evaluation of the claimant's pain improperly discounted the October 2006 MRI evidence that reveals "possible bilateral L5 nerve root encroachment, multilevel facet arthropathy and increased T2 signal within the L4-5 disc consistent with annular tears." (R. 239). Presumably, the claimant asserts this argument under the theory that, if the ALJ determined that the claimant had a medically determined impairment of nerve root encroachment, this finding would satisfy the third part of the Eleventh Circuit's pain standard as an "objectively determined medical condition of such a severity that it can reasonably be expected to give rise to the alleged pain." *See Holt*, 921 F.2d at 1223. This court, however, will affirm those factual determinations that are supported by substantial evidence, which is "more than a mere scintilla.  [Substantial evidence] means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). And though this court must "scrutinize the record in its entirely to determine the reasonableness of the [Commissioner]'s factual findings" (*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987)), that does not permit this court to reweigh the evidence or decide facts anew. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 1995). The question, then, is not whether the ALJ properly weighed a particular piece of evidence, but whether substantial evidence from the entire record supports the ALJ's implied determination that the claimant did not suffer from "bilateral L5 nerve root encroachment."

28

This court finds that the ALJ's implied determination that the claimant did not suffer from bilateral L5 nerve root encroachment is supported by substantial evidence. This court reaches that conclusion by first noting that the MRI did not definitively reveal nerve root encroachment, but rather only revealed *possible* nerve root encroachment. As such, the ALJ had to evaluate this possibility in light of other medical evidence, and the ALJ – after specifically considering the MRI evidence – concluded that the next four years of medical evidence revealed "mostly negative findings." (R. 291). For instance, multiple x-rays and examinations of the claimant led at least two separate doctors (Dr. Gill and Dr. Norwood) to conclude that the claimant did not have any neurological deficits. (R. 453, 555).  In the face of such evidence, this court concludes that the ALJ's determination was supported by substantial evidence.  This court declines the claimant's tacit invitation to re-weigh the evidence, which is beyond its jurisdiction. The ALJ properly applied the Eleventh Circuit's three-part pain standard.

**II. The ALJ Properly Weighed the Medical Source Opinions of Record.**

The claimant also argues that the ALJ improperly weighed the medical source opinions of record by relying on the RFC assessment of the consulting physician, Dr. Norwood, while discounting the assessment of the treating physician, Dr. Davis. The claimant argues that this reliance was improper because the ALJ failed to articulate reasons for weighing the medical source opinions as he did. The claimant, citing 20 C.F.R. 404.1527(d)(1)(2)(i)(ii), argues that the ALJ must generally give the treating physician's opinion greater weight than a consultative physician's opinion, and that the ALJ did not state why he ignored this general principle.

This court acknowledges that a treating physician's opinion should generally be given more weight than that of a consultative physician, but additionally acknowledges that the Commissioner may reject any medical opinion if the evidence supports a contrary finding. See

*Syrock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985). Moreover, the ALJ has good cause to discredit a treating doctor's opinion when it is conclusory, inconsistent with the doctor's own medical records, "not bolstered by the evidence, or where the evidence supported a contrary finding." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

In the current case, the ALJ specifically found that "Dr. Norwood's opinion is more consistent with the record as a whole." Finding that the evidence supports a finding contrary to Dr. Davis' opinion is a valid reason for the ALJ to rely on Dr. Norwood's assessment rather than Dr. Davis'. Especially noteworthy, however, is the ALJ's determination that "Dr. Davis' opinion is [not] supported by the medical evidence of record." (R. 290-91). Indeed, in examining Dr. Davis' questionnaire, this court cannot tell if Dr. Davis' assessment is supported by *any* evidence at all because Dr. Davis did not indicate what evidence he relied upon in assessing the claimant's level of pain. Dr. Davis' assessment appears wholly conclusory, which is itself a sufficient reason to discard his opinion. (*See* R. 585-86). The ALJ, however, discarded Dr. Davis' assessment because (1) the evidence did not bolster Dr. Davis' assessment, and (2) Dr. Davis' assessment could not be supported by the claimant's subjective testimony because the claimant's testimony was not credible. (R. 290-91).

Dr. Davis filled out the relevant questionnaire after a nine-month history with the claimant. During those nine months, however, Dr. Davis' records indicate very few clinical findings beyond the initial June 10, 2010 examination. At that time, Dr. Davis noted pain and softness in the claimant's left knee and lower back, and that the claimant was stressed and anxious. Dr. Davis prescribed Lortab, Soma, Phenergan, Percocet, and Xanax to control the claimant's symptoms. (R. 546). Dr. Davis' subsequent records contain no examination results and mostly indicate refills for these prescriptions that, Dr. Davis indicated, adequately managed

the claimant's pain. (R. 566-83). Thus, if Dr. Davis' medical records are any indicator, Dr. Davis' pain assessment relies on very little first-hand, objective clinical information because Dr. Davis made very few objective clinical findings.

Additionally, the ALJ discounted Dr. Davis' pain assessment to any degree that it might have relied upon the claimant's subjective complaints of pain. (R. 291). Given Dr. Davis' medical records, which largely consist of the claimant's subjective complaints and Dr. Davis' prescriptions for those complaints, Dr. Davis' assessment likely relied heavily on such subjective testimony. The ALJ, however, found that the claimant's testimony was not credible in as far as it conflicted with a restricted RFC for light work, and as this court has already noted, substantial evidence supports the ALJ's credibility finding. Thus, substantial evidence also supports the ALJ's finding that Dr. Davis' pain assessment is unreliable to any degree that it relied upon the claimant's subjective testimony.

Finally, to the degree that Dr. Davis' assessment relies on his scant clinical findings, the ALJ found that sufficient evidence existed to discount Dr. Davis' opinion and rely on Dr. Norwood's assessment. The ALJ noted that no doctor had recommended that the claimant receive further back or knee surgery since his initial surgery in March 2002, and that examinations and x-rays had revealed "mostly negative findings." The ALJ noted Dr. Norwood's findings that the claimant's strength was good; his sensations were normal; he had only a mildly limited range of motion; and had neither definite signs of neurological deficit, nor neurological impairments for work-related activities. The ALJ further considered that Dr. Norwood completed his RFC assessment based on the claimant's subjective complaints *in the absence of* neurological deficits, so that Dr. Norwood's RFC assessment constituted the minimum that the claimant could perform without findings of neurological impairment. (R. 291). After each RFC

31

assessment, Dr. Norwood specifically noted the medical evidence that supported his opinion. (R. 556-61).

This court finds that the ALJ properly evaluated the medical opinions before him, and that substantial evidence supports the ALJ's determination that Dr. Norwood's assessment is more consistent with the record as a whole.

**3. The ALJ and Dr. Norwood Responded to this Court's Remand Order**

The claimant also argues that the ALJ's opinion should be reversed because neither the ALJ nor Dr. Norwood properly responded to this court's March 17, 2010 remand order. The claimant argues that this court remanded the case back to the ALJ to obtain "clarification" on Dr. Norwood's medical assessment, and that obtaining an entirely new examination of the claimant from Dr. Norwood was wholly unresponsive to that order. This court disagrees.

According to his court's March 17, 2010 opinion, this court remanded this case to the ALJ for further proceedings because the ALJ had relied upon an incomplete medical assessment when finding that the claimant was not disabled. Specifically, Dr. Norwood's initial medical opinion did not include an assessment of the claimant's ability to sit, stand, or walk, or the durations for which the claimant could perform each activity. Dr. Norwood's opinion also failed to assess the claimant's ability to lift or carry, or the weights and durations for which the claimant could perform these activities. This court ordered the ALJ to make a second disability determination that was supported by substantial evidence. (R. 307-21).

For the ALJ to respond to that order, he would necessarily need to obtain additional evidence from Dr. Norwood or rely on another source entirely. The ALJ decided to obtain additional evidence from Dr. Norwood, who specifically assessed the functional limitations that he had originally omitted after examining the claimant again. Dr. Norwood found that the

claimant could lift and carry ten pounds frequently and up to twenty pounds occasionally; could

sit, stand, and walk for up to ten minutes at one time; could sit for up to six hours in an eight

hour work day; and could stand and walk for up to one hour in an eight hour work day. (R. 556-

57). These findings are the precise pieces of information that were originally missing from Dr.

Norwood's assessment, and the precise pieces of information that this court ordered the ALJ to

consider. As a result, this court finds that the ALJ responded appropriately to this court's order,

and the claimant's argument to the contrary is without merit.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is

supported by substantial evidence. Therefore, the court will AFFIRM the Commissioner's

decision. The court will enter a separate Order consistent with this opinion.

DONE and ORDERED this 14th day of March, 2013.

_Karon O. Bowdre_
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE